1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TREEHOUSE LAW, LLP**
Benjamin Heikali (SBN 307466)
2121 Avenue of the Stars, Suite 2580
Los Angeles, CA 90067
Telephone: (310) 751-5928
bheikali@treehouselaw.com

*Attorneys for Plaintiff and the Putative Classes*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGAN FEHRENBACH, on behalf of herself and all others similarly situated,<br><br>            Plaintiff,<br><br>       v.<br><br>DREAMLAND BABY CO., a California Corporation,<br><br>            Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Megan Fehrenbach ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, brings this Class Action Complaint against Dreamland Baby Co. ("Defendant" or "Dreamland"), based upon personal knowledge as to herself, and upon information, investigation and belief of her counsel.

## INTRODUCTION

1.    Dreamland manufactures, markets, and sells weighted sleep products for children including, but not limited to: the Dream Weighted Sleep Sack; weighted swaddles such as the Dream Weighted Sleep Swaddle, the Dream Weighted Transition Swaddle, and the Bamboo Weighted Transition Swaddle; and a Weighted Toddler Blanket (collectively, the "Products").

2.    Dreamland boldly markets that it works with "expert advisors" to ensure the Products are "safe [and] effective products that meet the highest quality standards."[1] By way of example, Defendant's advertising on the Product pages states that the Products were "Designed in collaboration with pediatricians, NICU nurses and certified sleep consultants" and "Reviewed by pediatric pulmonologist for breathing safety."

3.    Dreamland further markets its Products as "design[ed] … according to the American Academy of Pediatricts safe sleep guidelines," and promises that the Products "exceed[] all United States Consumer Product Safety Commission Standards," despite these statements being completely false and misleading.

4.    Unbeknownst to consumers, however, the Products are not safe and do not meet industry or regulatory guidelines for baby sleep products. Indeed, the American Academy of Pediatrics ("AAP"), the U.S. Consumer Product Safety Commission ("CPSC"), the U.S. National Institute of Child Health and Human Development ("NIH"), and the U.S. Centers for Disease Control and Prevention

---

[1] https://dreamlandbabyco.com/pages/medical-expert

("CDC") have all advised *against* the use of weighted sleep sacks and weighted swaddles on infants, with some of these agencies expressly warning that these baby products are harmful. As such, the Products' marketing and advertising is deceptive and misleading.

5. Defendant is well aware of the industry and regulatory position on weighted baby sleep sacks and swaddles, the dangers posed in using these products, and of actual consumer complaints regarding the safety of the Products. Prior to the 2022 AAP report (referenced *infra*), there were no regulations that applied to weighted baby sleep sacks and swaddles, and following the 2022 AAP report, every industry and regulatory agency has explicitly stated that "weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects are not to be placed on or near a sleeping infant." Nonetheless, in callous disregard for safety, Defendant continues to sell the Products, without any effort to redesign the Products or to warn consumers that various health and safety regulatory agencies advise against their use. Instead, Defendant has continued to market the Products as safe, medically approved and meeting/exceeding all industry and regulatory standards.

6. As a result, Dreamland's labeling and advertising of the Products with representations about their medical approval and safety, misleads reasonable consumers to believe that the Products are safe for babies and comply with industry and regulatory standards for baby sleep products.

7. Plaintiff and other consumers purchased the Products and paid a premium price based upon their reliance on Defendant's advertising about the safety of the Products. Had Plaintiff and other consumers been aware that the Products are not safe or that they do not comply with industry and regulatory guidelines, they would not have purchased the Products or would have paid significantly less for them. Accordingly, Plaintiff and Class members have been injured by Defendant's deceptive business practices.

1

## JURISDICTION AND VENUE

2     8.     This Court has subject matter jurisdiction pursuant to the Class Action

3 Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed

4 under Rule 23 of the Federal Rules of Civil Procedure, there are thousands of

5 proposed Class members, the aggregate amount in controversy exceeds $5,000,000

6 exclusive of interest and costs, and Defendant is a citizen of a state different from at

7 least some members of the proposed Classes.

8     9.     This Court has personal jurisdiction over Defendant because Defendant

9 has sufficient minimum contacts in California, or otherwise intentionally avails

10 itself of the markets within California, through its sale of goods and products

11 (including the Products) in California and to California consumers, and throughout

12 the United States. Moreover, Defendant maintains its principal place of business in

13 California.

14    10.    Venue is proper in this judicial District pursuant to 28 U.S.C. §

15 1391(b)(1) because Defendant resides in this judicial District.

16 **I.     Plaintiff Megan Fehrenbach**

17    11.    Plaintiff Megan Fehrenbach is a citizen of California and currently

18 resides in Escondido, California. On or around December 10, 2023, Plaintiff

19 purchased two Dreamland Baby Weighted Sleep Sacks (one 6-12 months and one

20 12-24 months) from the Dreamland Baby website for $95.90 combined. Prior to

21 purchasing the Products, Plaintiff saw Defendant's advertising on the Product pages

22 stating that the Products were "Designed in collaboration with pediatricians, NICU

23 nurses and certified sleep consultants" and "Reviewed by pediatric pulmonologist

24 for breathing safety."  On the same product pages, Plaintiff saw the "Frequently

25 Asked Questions" section which claimed that the Products were safe. Moreover,

26 prior to purchasing the Products, Plaintiff also saw the Dreamland Baby FAQ page,

27 which stated that the Products "exceed all U.S. Consumer Product Safety

28 Commission standards," among other claims about the safety of the Products.

-3-

Based on these representations, Plaintiff reasonably believed the Products were safe and met industry and regulatory guidelines for baby sleep products. Had she known that the Products were not safe or did not meet industry and regulatory guidelines for baby sleep products, she would not have purchased the Products, or would have paid significantly less for them. As such, Plaintiff has been directly financially injured by Defendant's false and misleading advertising.

12. Despite Defendant's misrepresentations, Plaintiff would purchase the Products, as advertised, if they were safe for use for her infant and met industry and regulatory guidelines for baby sleep products. Although Plaintiff regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff currently believes the Products' labeling and advertising is inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the representations on the Products' front label and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the alleged misleading representations. In addition, other Class members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet industry and regulatory guidelines for baby sleep products.

## II.    Defendant Dreamland Baby Co.

13. Defendant is a California corporation with its principal place of business in Newport Beach, California. Defendant, through its agents, is responsible for the manufacturing, design, testing, advertising, marketing, labeling, distribution, and sale of the Products in California and throughout the United States.

# **FACTUAL ALLEGATIONS**

**I.    Dreamland Markets the Products as Safe and Medically Approved**

14.    Dreamland has labeled and advertised the Products with representations about their medical approval and safety, leading reasonable consumers to believe that the Products are safe for babies, approved by independent and qualified medical professionals, and comply with industry and regulatory standards for baby sleep products.

15.    The front labels of the Products state "Safety Certified" and "Doctor Approved:"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    16.    Moreover, the Products' descriptions on Dreamland's website claim

18  that the Products are "designed in collaboration with pediatricians, NICU nurses,

19  and certified sleep consultants," and "reviewed by pediatric pulmonologist for

20  breathing safety."[2]

21
22
23
24
25
26

27    [2] https://dreamlandbabyco.com/products/dream-weighted-sack-

28  swaddle?variant=40784606330943

CLASS ACTION COMPLAINT

1

2

DESCRIPTION                                    >

3

WHY YOU'LL LOVE IT                             >

4

LEARN MORE                                     ⌄

5

Gentle weight is located on the front (or top) of the
sack only and is not intended to restrict movement.

6

This sleep sack is a 1.0 TOG, perfect for 68-73°F or

7

21-23°C

Designed in collaboration with pediatricians, NICU

8

nurses and certified sleep consultants

9

Reviewed by pediatric pulmonologist for breathing
safety

10

11

Inner beads are non-toxic, BPA free

For safety reasons, we do not recommend sizing up

12

13      17.    Until more recently, the Product pages also advertised the safety of the

14    Products.[3]

15



DREAM WEIGHTED SLEEP SACK

16

CoverCalm® Technology

17

Evenly distributed weight from your baby's shoulders to toes to
naturally reduce stress and give your baby the feeling of security

18

and comfort.

19

20

21    Care                                                                    >

22    Frequently Asked Questions                                              ⌄

23    Are weighted sleep sacks for babies safe?

The benefit of a gently weighted sleep sack is that they are a comfortable and cozy alternative to loose blankets, which should never be used in a
crib. When used properly and sized correctly, these wearable blankets keep your little one warm without overheating, which can be a risk factor

24    for SIDS. Learn more about sleep sack safety here!

25      [3] *See, e.g.*,

26    https://web.archive.org/web/20240220200314/https://dreamlandbabyco.com/product

27    s/dream-weighted-sleep-sack;
       https://web.archive.org/web/20240324063848/https://dreamlandbabyco.com/product

28    s/dream-weighted-sack-swaddle

CLASS ACTION COMPLAINT

Frequently Asked Questions

Are weighted swaddles safe?
Yes! In fact, Dreamland Baby was developed in partnership with pediatricians, NICU nurses, and certified sleep consultants. Reviewed by pediatric pulmonologist for breathing safety.

18.    Dreamland's website FAQs on product safety (which were posted up until at least August 2023) similarly represented that the Products are safe and "exceed all U.S. Consumer Product Safety Commission standards."[4]

Is Dreamland Baby® safe?                                              ⌃

Safety is our number one priority. As a mom-owned business, nothing is more important to us, which is why we partnered with pediatricians, NICU nurses, and certified sleep consultants when developing our weighted sleep sacks.

Our products exceed all U.S. Consumer Product Safety Commission standards and we use only natural and non-toxic materials. The International Hip Dysplasia Institute acknowledges the Dreamland Baby Weighted Swaddle as a "hip-healthy" product when used as directed.

We also pulled research from this clinical study demonstrating that weighted blankets are safe for newborns, significantly increase calm feelings, and improve sleep patterns. You can learn more about our commitment to safety here. With over 500,000 products sold, we have never had an adverse event caused by our products.

19.    The same claim (and others) was made on a product safety page on the Dreamland website.[5]

_____

[4] https://web.archive.org/web/20230808075326/https://dreamlandbabyco.com/pages/faq-producty-safety-and-care

[5] https://web.archive.org/web/20230926020034/https://dreamlandbabyco.com/pages/safety?_pos=1&_sid=119413d57&_ss=r

-9-

CLASS ACTION COMPLAINT



We've proudly exceeded all United States
Consumer Product Safety Commission
Standards

We use 100% natural, soft cotton. Our fabrics are not treated with flame retardant and the inner
poly pellet beads are non-toxic. **We source only the best materials for ultimate comfort and
safety.**

Rigorously Tested

Our products undergo both required and non-
required testing

We have the highest standards in quality and safety in every aspect in all of our products.

Safety     Materials     Durability

Thermal Transmittance  • Sharp Edges & Points  • Small parts: Choking Hazard  • Small parts: Use & Abuse  • Small parts: Torque & Tension  • Suffocation Hazards  • Tracking Labels for Children's Sleepwear
• Size Verification of Children's Sleepwear

20.     Dreamland's website also features a blog post from February 28, 2024, dedicated to convincing customers that their Products are sleep safe for use on babies, including a section where the company states that it is following guidelines of safe sleep outlined by the AAP.[6]

### How We Know Our Weighted Swaddles and Weighted Sacks are Safe

In this article, we've confirmed that wearable blankets are a safe way for your baby to sleep providing you follow the other guidelines of safe sleep outlined by the AAP (such as putting your baby to sleep on their back, on a firm surface, without other soft bedding in the crib).

We've also described how advantageous a weighted sack such as the one offered by Dreamland Baby can be for your little one.

---

[6] https://dreamlandbabyco.ca/blogs/news/weighted-sleep-sack-safety-and-how-it-will-help-your-baby-sleep; *see also* https://web.archive.org/web/20230926020919/https://dreamlandbabyco.com/blogs/news/weighted-sleep-sack-safety-and-how-it-will-help-your-baby-sleep?_pos=2&_sid=119413d57&_ss=r

## II.    Weighted Sleep Products are Not Safe and Do Not Meet Industry or Regulatory Standards

21.    Unbeknownst to consumers, the Products are not safe and do not meet industry or regulatory guidelines. Indeed, in a Policy Statement[7] issued by the AAP[8] in 2022, the AAP expressly warned that "weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects are not to be placed on or near the sleeping infant."[9] As to swaddles specifically, the AAP warned that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe and therefore not recommended."[10]

22.    In June 2023, the AAP doubled down on its policy, outlining its concerns with weighted infant sleep products in a letter to the CPSC and ASTM International.[11] Of note, the AAP wrote that "[t]he AAP believes these weighted swaddles and related products are unsafe for infants and does not recommend these products." The AAP explained its "clear policy regarding the danger of weighted infant sleep products:"

> The evidence available at this time does not indicate that weighted swaddle products are safe, nor does it demonstrate that they are effective in helping babies sleep longer or with fewer disruptions. Further, it is hypothesized that impaired arousal may contribute to risk of Sudden Infant Death Syndrome (SIDS), so a product that decreases arousal may increase the risk of SIDS.

---

[7] https://www.babycenter.com/baby/sleep/aap-safe-sleep-policy-weighted-swaddles-sids

[8] The AAP is a non-profit professional organization of 67,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents, and young adults.

[9] https://publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated-2022?autologincheck=redirected

[10] *Id.*

[11] https://www.documentcloud.org/documents/23849624-aap-letter-61523

[. . .]

Even preliminary, non-peer-reviewed data under discussion in ASTM
International proceedings suggest these products are associated with
concerning reductions in oxygen saturation levels in infants. This
means there is evidence that the use of weight sleep products on infants
can lead to lower oxygen levels, which if sustained, may be harmful to
the developing infant's brain.

23.    In the same letter, the AAP also opposed any efforts to develop
voluntary safety standards for these products, stating that voluntary safety standards
would send an incorrect message to families that "these unnecessary products are
safe."[12]

24.    The CPSC has followed course, issuing safe sleep recommendations
that also urge families not to use weighted blankets or weighted swaddles.[13] This
recommendation is based in part on the U.S. National Institute of Child Health and
Human Development's, and the U.S. Centers for Disease Control and Prevention's
positions on the issue, which are the same.[14] According to CPSC Commissioner
Richard L. Trumka, Jr., "[t]hese products are associated with concerning reductions

---

[12] Dreamland is well aware of the AAP's position but has blatantly chosen to
disregard its policy.
https://web.archive.org/web/20231203165603/https://dreamlandbabyco.com/blogs/n
ews/new-aap-guidelines-on-safe-sleep-and-sids-prevention ("The AAP included a
statement regarding weighted sleepwear and currently does not recommend its use.
The AAP provided no clear clinical evidence against the use of these products, and I
will continue recommending them as I've found them to be a valuable and safe sleep
aid for my patients.")

[13] https://www.cpsc.gov/SafeSleep

[14] https://safetosleep.nichd.nih.gov/reduce-risk/safe-sleep-environment;
https://www.cdc.gov/reproductivehealth/features/baby-safe-
sleep/index.html#:~:text=Weighted%20products%20such%20as%20weighted,with
%20no%20soft%20bedding%20use

in oxygen saturation levels in infants."[15] Commissioner Trumka also noted that "multiple infant deaths have occurred in weighted infant products."[16]

25.    In an interview with the Washington Post, Dr. Rachel Moon, the co-chair of the AAP task force on SIDS, explained why weighted blankets, swaddles, and sleep sacks were so dangerous to children: "When babies are first born, their rib cage is not rigid, and so it doesn't take a lot of pressure to press on it and create obstruction there. It makes it harder for them to breathe, it makes it harder for their heart to beat properly if there's pressure on there."[17]

26.    As a result of the AAP and CPSC's policies, retailers like Target, Amazon, Walmart, Nordstrom, and Babylist have removed weighted infant sleepwear, including weighted sleep blankets, swaddles and sacks—such as the Products—from their shelves and inventory.[18] "This is a strong first step, and infants deserve more," said AAP President Benjamin D. Hoffman, M.D., FAAP, following this announcement. "Exhausted parents shouldn't have to become part-time product safety regulators, but our current system forces them to by allowing infant products onto the market without evidence they are safe. We need a proactive approach that keeps infants safe and gives parents the peace of mind they deserve."[19]

27.    The decision by these major retailers to pull Defendant's Products and similar items from their shelves was also met with approval from one CPSC Commissioner, who noted that the retailers were "acting as responsible stewards of

---

[15] https://www.cpsc.gov/s3fs-public/Trumka_Statement_Weighted_Infant_Products_4_26_24_with_attachments.pdf?VersionId=iK5EDmatuGu9_z2jKt8t8BaWndFKwWCh

[16] *Id.*

[17] https://www.washingtonpost.com/wellness/2024/01/22/weighted-baby-blankets-unsafe/

[18] https://www.npr.org/2024/05/02/1248194639/weighted-infant-sleepwear-amazon-target-safety

[19] https://publications.aap.org/aapnews/news/28768/AAP-leaders-call-decision-to-pull-harmful-weighted

CLASS ACTION COMPLAINT

public safety [and] focusing on their customers' best interests" in stopping the sale of the items. That Commissioner also noted that he had "sat with parents of a child who died in one of these products, and I carry their grief with me."[20]

### III.    Dreamland Has Actual or Constructive Knowledge that the Products are Not Safe and Do Not Meet Industry or Regulatory Standards

28.    Dreamland is well aware that approximately 3,500 sleep-related infant deaths that occur annually in the United States.[21] In 2020, there were about 1,389 deaths due to SIDS, about 1,062 deaths due to unknown causes, and about 905 deaths due to accidental suffocation and strangulation in bed.[22]

29.    Dreamland has further been aware of risks associated with infants' use of the Products through various consumer complaints to CPSC. For example, on February 15, 2024, a consumer reported the death of her 2-month-old child who was wearing a .8 lb. Product:[23]

**Incident Details**

**Incident Description:** Child was placed in Dreamland Baby weighted swaddle sack (0-8 lbs) and placed in swing where she died.
**Incident Date:** 6/16/2023
**Incident Location:** Home/Apartment/Condominium

30.    On March 15, 2024, another infant death was reported while wearing a Product:[24]

---

[20] https://www.cpsc.gov/s3fs-public/Trumka_Statement_Weighted_Infant_Products_4_26_24_with_attachments.pdf?VersionId=iK5EDmatuGu9_z2jKt8t8BaWndFKwWCh; *see also* https://www.blumenthal.senate.gov/imo/media/doc/2024-04-25_blumenthal_letter_ftc-dreamland_baby_-nested_bean.pdf
[21] Moon, Rachel Y. et al, AAP TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, 138 Pediatrics 5(2016)
[22] *Id.*
[23] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4559262
[24] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4703727

-14-

**Incident Details**

**Incident Description:** My nearly three month old son was wearing a Dreamland Baby Co product, the Dream Weighted Sleep Swaddle. I laid him to sleep and when I left the room I was able to see his face. When I returned, he was face down. I believe he turn and couldn't turn back from the weight of the sleep sack. He passed away.

**Incident Date:** 10/26/2023

**Incident Location:** Home/Apartment/Condominium

31.     Despite Dreamland's knowledge of the safety concerns related to the use of the Products, and the infant deaths that have been reported through the use of the Products, it has continued to sell the Products and has failed to make any effort to redesign the Products to conform to Dreamland's representations about its safety and compliance with industry and regulatory standards.

32.     Further Dreamland has failed to warn consumers of the risks associated with the use of the Products. Indeed, instead of recalling the Products, redesign the Products, and/or warn purchasers about them, Dreamland continues to manufacture, market, and sell the Products as a ***safe*** infant sleeping product that meets or exceeds all industry and regulatory standards.

33.     In fact, when consumers have referenced the 2022 AAP report in Product reviews, Dreamland has responded disingenuously that it had no "reason to believe they were unsafe" and that they "proudly stand behind the safety and efficacy of out gently weighted products."

Anne W.  
Baby's Age Range  0-6 Months    Baby's Sleeping Style  Back    Is This Your First Child?  Yes    4 weeks ago

Reviewing  
Dream Weighted Sleep Sack

☆☆☆☆☆

**Unsafe**

Please do your homework before purchasing a weighted item for your baby. The American Academy of Pediatrics Safe Sleep Recommendations published in 2022 say, " Weighted swaddles, weighted clothing or weighted objects on or near the baby are not safe and not recommended."

Was this helpful?  👍 1  👎 0

Dreamland Baby    4 weeks ago  
The safety of our customers is always our top priority. We want to assure you that we would never sell Dreamland Baby products if we had any reason to believe they were unsafe. We have thoroughly tested our products and have the highest quality control standards. If you need further assurance, we encourage you to read the reviews on our website from other customers who have used our products and found them to be safe and effective.

CLASS ACTION COMPLAINT



## IV. Dreamland's "Scientific" Support Lacks Veracity

34. The studies that Dreamland touts as demonstrating the Products' safety and industry and regulatory compliance, are similarly misleading. For example, the 2020 study referenced in a blog post studied the use of weighted **blankets**[25] on infants with **neonatal abstinence syndrome (NAS),** a rare syndrome affecting babies exposed to certain substances during pregnancy, such as opioids.[26] Babies with NAS exhibit symptoms such as hyperactivity, irritability, tremors, excessive high-pitched crying, restlessness, increased tone, jitteriness, poor sleep patterns, sweating, frequent sneezing, increased respiratory rate, excessive sucking, poor feeding, vomiting, and watery stools. As such, the test is largely inapplicable to the vast

---

[25] Ironically, Dreamland claims that weighted blankets are *not* safe. *See* https://dreamlandbabyco.ca/blogs/news/weighted-sleep-sack-safety-and-how-it-will-help-your-baby-sleep ("Weighted blankets are not safe for infants because regular blankets are not safe for infants; they are a suffocation hazard. Weighted blankets are even more dangerous as their added weight would make it harder for infants to pull the blanket away from their mouth and nose."). Nonetheless, it has sold weighted blankets to consumers. *See* https://web.archive.org/web/20240105215521/https://dreamlandbabyco.com/products/dream-weighted-blanket.

[26] *See* https://cdn.shopify.com/s/files/1/0158/3415/3024/files/Summe_2020.pdf?v=1587419817 at 2 ("The purposes of this pilot study were (1) to assess the safety of using weighted blankets in the care of hospitalized infants with NAS, (2) to explore the feasibility of using weighted blankets in this patient population, and (3) to obtain preliminary data on effectiveness of weighted blankets in decreasing symptoms of NAS.").

majority of consumers to whom the Products are marketed. Another limitation to the study was the small sample size of only 16 infants.[27] Lastly, the study examined the use of weighted blankets with monitored infants in a NICU setting, rather than in a non-clinical setting such as in a home. As such, the study is largely inapplicable to the vast majority of consumers to whom the Products are marketed.

35.    A second study referenced by Dreamland, conducted in 2012, assessed the physiological effects of the use of weighted blankets *in female adults* (ages 22-33), and is therefore completely irrelevant to safety of weighted sleep sack use on *infants.*[28] The same issue plagues Dreamland's citation to a 2006 study on the "Safety and Therapeutic Effects of Deep Pressure Stimulation Using a Weighted Blanket," which again was conducted on adults, rather than infants.[29]

36.    As a result, at all times in which the Products were manufactured, marketed, and sold, Dreamland lacked any credible basis for its claims that the Products were safety certified, doctor approved, and met or exceeded all industry and regulatory standards.

## V.    Dreamland's Marketing of the Products is Misleading to Reasonable Consumers

37.    Unfortunately for consumers, Defendant engages in false and misleading advertising for the Products to gain a competitive edge in the market, all at the expense of unsuspecting consumers. As outlined herein, Defendant accomplishes this by using front label and other advertising claims that lead reasonable consumers to believe that the Products help children sleep better, are safe for use, are doctor approved, and meet or exceed all industry and regulatory standards, when that is far from the case.

---

[27] *Id*.

[28] https://cdn.shopify.com/s/files/1/1380/9417/files/Deep_Touch_Pressure_Study.pdf?2268144407711311749

[29] https://www.tandfonline.com/doi/abs/10.1300/J004v24n01_05

38.    Similarly, Dreamland's failure to include information on the label or advertising regarding the potential risks of use of the Products is further misleading as an omission.

39.    The expectation that the Products are safe for babies is material to consumers' decision to purchase the Products, particularly because weighted baby sleep sacks and swaddles are considered harmful to babies and the AAP and CPSC have both determined the same.[30]

40.    Had consumers known the truth about the Products, or had consumers been made aware of the potential risks of use of the Products, they would not have purchased them, would have paid significantly less for them, or would have purchased a different product. As a result, consumers have been financially injured by Dreamland's labeling and advertising practices.

41.    Alternatively, Plaintiff and Class Members were deprived the benefit of their bargained-for exchange and have suffered damages in an amount to be established at trial.

### FED. R. CIV. P. 9(b) ALLEGATIONS
*(Affirmative and By Omission)*

42.    Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Although Dreamland is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, to the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

---

[30] By way of example, SIDs is a leading cause of death in approximately 3,400 infants each year and most of these deaths are due to accidental deaths from suffocation or strangulation in otherwise healthy infants.

-18-

43.    **WHO**: Dreamland made material misrepresentations and/or omissions of fact in its website representations, warranties, owner's manuals, labeling and marketing, warranty claims, and through authorized retailers of the Products, which include statements such that the Products were safe and suitable for overnight and/or prolonged infant sleep, were doctor approved, and met or exceeded all industry and regulatory standards.

44.    **WHAT**: Dreamland's conduct here was, and continues to be, fraudulent because the Products are unsuitable and unsafe for infant sleep, and because Defendant has omitted and concealed that the Products are unsafe, fail to meet any industry or regulatory standards, and are marketed premised upon irrelevant studies. Dreamland made affirmative misrepresentations to Plaintiff and Class Members at the time of purchase regarding the same qualities. Further, Dreamland's conduct has the effect of deceiving Plaintiff and Class Members into believing that the Products are safe and suitable for overnight and/or prolonged infant sleep and met all industry and regulatory standards. Dreamland knew or should have known this safety information and industry and regulatory compliance is material to the reasonable consumer, including Plaintiff and Class Members, and impacts their purchasing decisions, and yet it omits a necessary warning that the Products are unsafe, unsuitable for overnight and/or prolonged infant sleep, and failed to meet industry and regulatory standards.

45.    **WHEN**: Dreamland made the material misrepresentations and/or omissions detailed herein at the time Plaintiff and Class Members performed research on the Products to gather information that would aid them in selecting an infant sleep sack to purchase, at the time Plaintiff and Class Members purchased the Products, at the time Plaintiff and Class Members submitted customer reviews regarding safety concerns, and continuously throughout the applicable Class periods.

46.    **WHERE**: Dreamland's material misrepresentations and/or omissions were made on its website, through marketing materials, in warranties, in user manuals, on the labeling of the packaging, and through authorized retailers.

47.    **HOW**: Dreamland made written misrepresentations and/or failed to disclose material facts regarding the true safety risks and serious dangers created by normal use of the Products in written form, electronic form, or conventional hardcopy form, as well as verbally through statements it made and authorized retailers. Dreamland further made written misrepresentations and/or failed to disclose material facts regarding the Products' compliance with industry and regulatory compliance in written form, electronic form, or conventional hardcopy form, as well as verbally through statements it made and authorized retailers. Lastly, Dreamland made written misrepresentations and/or failed to disclose material facts regarding the relevance and veracity of the studies upon which Dreamland premised many of its representations upon in written form, electronic form, or conventional hardcopy form, as well as verbally through statements it made and authorized retailers.

48.    **WHY**: Dreamland engaged in the material misrepresentations and/or omissions detailed herein (*e.g.*, knowing and concealing that knowledge of the safety of the Products, the Products' compliance with industry and regulatory standards, and the studies upon which it relies) for the express purpose of inducing Plaintiff, Class Members, and other reasonable consumers to purchase and/or pay for the Products. Dreamland profited by selling the Products to many thousands of consumers.

49.    **INJURY**: Plaintiff and Class Members purchased the Products when they otherwise would not have absent Dreamland's misrepresentations and/or omissions, and, alternatively, paid more for the Products than they would have absent Dreamland's misrepresentations and/or omissions.

CLASS ACTION COMPLAINT

**CLASS ACTION ALLEGATIONS**

50.    Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the members of the following proposed nationwide class ("Nationwide Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the United States for personal use and not resale.**

51.    Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of herself and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, and Washington[31] within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

52.    Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following California class ("California Class"):

---

[31] Plaintiff seeks to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*).

-21-

**During the fullest period allowed by law, all persons who purchased the Products in the State of California**.

53.    The Nationwide Class, Multi-State Consumer Protection Class, and the California Class are referred to collectively as the "Class" or "Classes," and the members of the Classes are referred to as the "Class Members." Excluded from the Classes are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

54.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or add subclasses before the Court determines whether class certification is appropriate.

55.    Plaintiff is a member of all the Classes.

56.    **Numerosity:** Members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. The precise number of Class Members is unknown to Plaintiff but is likely to be ascertained by the Defendant's records. At a minimum, there likely are at least thousands of Class Members.

57.    **Commonality:** There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitation:

a.  whether Defendant's course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;

b.  whether reasonable consumers would rely upon Defendant's representations about the Products and reasonably believe the

CLASS ACTION COMPLAINT

Products are safe for infant use and meet all industry and regulatory standards;

c. whether Defendant knew or should have known its representations were false or misleading;

d. whether Defendant was unjustly enriched by retaining monies from the sale of the Products;

e. whether certification of each Class is appropriate under Rule 23;

f. whether Plaintiff and the Members of each Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and

g. the amount and nature of the relief to be awarded to the Plaintiff and the Classes, including whether Plaintiff and the Classes are entitled to punitive damages.

58. **Typicality:** Plaintiff's claims are typical of the other Class Members because Plaintiff, as well as Class Members, purchased the Products and relied on the representations made by the Defendant about the Products prior to purchasing the Products. Plaintiff and the Members of each Class paid for Defendant's Products and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue.

59. **Adequacy:** Plaintiff will fairly and adequately protect the interests of the proposed Classes as her interests do not conflict with the interests of the Members of the proposed Classes she seeks to represent, and she has retained counsel competent and experienced in class action litigation. Thus, the interests of the Members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

60. **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Complaint predominate over any other questions affecting only individual Members of the Classes. Class issues fully predominate over any

-23-

individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's misconduct detailed at length in this Complaint.

61.   **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Complaint/lawsuit. Further, because of the damages suffered by any individual Class Member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class Members may be unaware that claims exist against the Defendant.

62.   **Declaratory and Injunctive Relief**: Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and Members of the Classes will continue to be misled, harmed, and denied their rights under the law.

## FIRST CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
***(By Plaintiff, individually and on Behalf of the Multi-State Consumer Protection Class)***

63.   Plaintiff, individually, and on behalf of the Multi-State Consumer Protection Class, realleges paragraphs 1-62 as if fully set forth herein.

64.   Plaintiff and Multi-State Consumer Protection Class Members have been injured as a result of Defendant's violations of the state consumer protection

statutes listed in Footnote Thirty-One above, which also provide a basis for redress to Plaintiff and Multi-State Consumer Protection Class Members based on Defendant's fraudulent, deceptive, unfair, and unconscionable acts, practices, and conduct.

65.     Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

66.     Defendant's marketing of the Products violates this prohibition by deceiving consumers into believing that the Products are safe and meet all industry and regulatory standards when they do not.

67.     Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of applicable law.

68.     Defendant engaged in misleading and deceptive advertising representing that the Products were safe and met all industry and regulatory standards. Defendant chose to package and market the Products in this way to impact consumer choices, extract price premiums, and gain market dominance, as it is aware that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe Defendant's false and misleading representations and omissions.

69.     Defendant intended that Plaintiff and other Multi-State Consumer Protection Class members would reasonably rely upon the material omissions concerning the true nature of the Products.

70.     Defendant's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and other Multi-State Consumer Protection Class members to be deceived about the true nature of the Products.

71.    As a direct and proximate result of Defendant's violations of California law (and the laws identified in Footnote Thirty-One), as set forth below, Defendant caused Plaintiff and other Multi-State Consumer Protection Class members to have suffered ascertainable loss of money caused by Defendant's misstatements and omissions.

72.    Had they been aware of the true nature of the Products, Plaintiff and other Multi-State Consumer Protection Class members either would have paid less for the Products or would not have purchased them at all.

73.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff and the Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive, and special damages, including, but not limited to, treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**SECOND CLAIM FOR RELIEF**
**Violation of California's Consumers Legal Remedies Act**
**California Civil Code § 1750, *et seq*.**
**(*By Plaintiff, individually and on Behalf of the California Class*)**

74.    Plaintiff repeats the allegations contained in paragraphs 1-62 above as if fully set forth herein.

75.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Consumer Subclass against Defendant pursuant to California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*.

76.    The Products are "good[s]" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of the Products by Plaintiff and members of the California Consumer Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

77. Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…" By using representations about the safety of the Products on the front label and advertisements, Defendant has represented and continues to represent that the Products have characteristics that they do not have. Therefore, Defendant has violated section 1770(a)(5) of the CLRA.

78. Cal. Civ. Code § 1770(a)(7) prohibits "[r]espresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By using representations about the safety of the Products on the front label and advertisements, Defendant has represented and continues to represent that the Products are of a particular standard that they do not meet. Therefore, Defendant has violated section 1770(a)(7) of the CLRA.

79. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By using representations about the safety of the Products on the front label and advertisements, and not delivering Products that are safe for infant use, Defendant has advertised the Products with characteristics it intended not to provide to consumers. As such, Defendant has violated section 1770(a)(9) of the CLRA.

80. Cal. Civ. Code § 1770(a)(9) prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." By using representations about the safety of the Products on the front label and advertisements, and not delivering Products that are safe for infant use, Defendant has advertised the Products with characteristics it intended not to provide to consumers. As such, Defendant has violated section 1770(a)(16) of the CLRA.

81. At all relevant times, Defendant has known or reasonably should have known that the representations about the safety of the Products on the front label and advertisement are false and deceptive, and that Plaintiff and other members of the

-27-

California Class would reasonably and justifiably rely on these representations when purchasing the Products. Nonetheless, Defendant deceptively advertises the Products as such in order to deceive consumers into believing they are receiving a safe sleep sack for their infant.

82. Plaintiff and members of the California Class have justifiably relied on Defendant's misleading representations when purchasing the Products. Moreover, based on the materiality of Defendant's misleading and deceptive conduct, reliance may be presumed or inferred for Plaintiff and members of California Class.

83. Plaintiff and members of the California Class have suffered and continue to suffer injuries caused by Defendant because they would have paid significantly less for the Products, or would not have purchased them at all, had they known that the Products are not safe and did not meet industry and regulatory standards.

84. Pursuant to Cal. Civ. Code § 1782, Plaintiff notified Defendant in writing by certified mail sent on May 23, 2024, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above and give notice to all affected consumer of Defendant's intent to do so. If Defendant does not agree to rectify the problems identified and give notice to all affected consumers within 30 days of the date of written notice, Plaintiff will amend this Complaint to seek actual, punitive, and statutory damages, as appropriate.

85. Attached hereto is a declaration establishing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(d).

86. In accordance with Civil Code § 1780(a), Plaintiff and the other California Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

### THIRD CLAIM FOR RELIEF
**Violation of California's False Advertising Law**

**California Business & Professions Code § 17500, *et seq***
***(By Plaintiff, individually and on Behalf of the California Class)***

87.    Plaintiff repeats the allegations contained in paragraphs 1-62 above as if fully set forth herein.

88.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California's False Adverting Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

89.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

90.    Defendant has represented and continues to represent to the public, including Plaintiff and members of the proposed California Class, through its deceptive labeling and advertising, about the safety and industry and regulatory compliance of the Products. Because Defendant has disseminated misleading information regarding the Products, and Defendant knows, knew, or should have known through the exercise of reasonable care that the representations were and continue to be misleading, Defendant has violated the FAL.

91.    Plaintiff and the California Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Products, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiff and the California Class. Defendant continues to market the Products as safe and meeting all industry and regulatory standards when they do not. Only injunctive relief can prevent any future harm.

92.    Additionally, Plaintiff seeks restitution if monetary damages are not

-29-

available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co*., 23 Cal.4th 163, 177 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez v. Wells Fargo Bank, NA*, 589 F. App'x 824, 827 (9th Cir. 2014) (same); *Caro v. Procter & Gamble Co*., 18 Cal. App. 4th 644, 661 (1993) ("In a suit arising under Business and Professions Code section 17200 *et seq*., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

93.    But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the California Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007), *as modified* (Apr. 24, 2007) (noting that restitution is available even in situations where damages may not be available).

94.    Plaintiff and California Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Defendant's fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

### FOURTH CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law ("UCL"),
California Business & Professions Code § 17200, *et seq.*
(*By Plaintiff, individually and on Behalf of the California Class*)**

95.    Plaintiff repeats the allegations contained in paragraphs 1-62 above as if fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant.

97.    The UCL, Cal. Bus. & Prof Code § 17200, provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

98.    Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Defendant's false and misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA, the FAL, and other applicable laws as described herein. As a result of Defendant's unlawful business acts and practices, Defendant has unlawfully obtained money from Plaintiff and Members of the proposed California Class.

99.    Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims. Defendant's conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful, and is injurious to consumers who rely on the labeling. Deceiving consumers into believing they will receive a safe sleep sack for their infant that meets all industry and regulatory standards is of no benefit to consumers. Therefore, Defendant's conduct was and continues to be "unfair." As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiff and Members of the proposed California Class.

100.   Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public. Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are safe and meet industry and regulatory standards when they are not and do not. Because Defendant misled Plaintiff and Members of the California Class, Defendant's conduct was "fraudulent." As a result of Defendant's fraudulent business acts and practices,

Defendant has and continues to fraudulently obtain money from Plaintiff and Members of the California Class.

101.   Plaintiff and the California Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Products, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiff and the California Class. Defendant continues to market the Products as safe and meeting all industry and regulatory standards when they do not. Only injunctive relief can prevent any future harm.

102.   Additionally, Plaintiff seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez,* 23 Cal.4th at 177 (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez*, 589 F. App'x at 827; *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

103.   But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiff and the California Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe*, 150 Cal. App. 4th at 68 (noting that restitution is available even in situations where damages may not be available).

104.  Plaintiff and California Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Defendant's unfair, unlawful and fraudulent business practices; declaratory relief;

reasonable attorneys' fees and costs under California Code of Civil Procedure §
1021.5; injunctive relief and other appropriate equitable relief.

## FIFTH CLAIM FOR RELIEF
### Breach of Express Warranty
### Cal. Com. Code § 2313
**(On Behalf of Plaintiff, individually and on behalf of the Nationwide Class, or in the Alternative, the California Class)**

105.   Plaintiff repeats the allegations contained in paragraphs 1-62 above as if fully set forth herein.

106.   Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class, or in the alternative, California Class against Defendant.

107.   California's express warranty statutes provide that "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

108.   Defendant has expressly warranted on the Products' front packaging that the Products are safe. However, as alleged herein, these express representations are false and misleading. The Products are not safe for use as a sleep sack for infants and do not meet industry and regulatory standards.

109.   Defendant's representations that the Products are "Safety Certified" and "Doctor Approved" on the Products' front labels and advertising are: (a) affirmations of fact or promises made by Defendant to consumers that the Products are safe and meet all industry and regulatory standards; (b) became part of the basis of the bargain to purchase the Products when Plaintiff and other consumers relied on the representations; and (c) created an express warranty that the Products would conform to the affirmations of fact or promises. In the alternative, the representations about the Products are descriptions of goods which were made as

-33-

part of the basis of the bargain to purchase the Products, and which created an express warranty that the Products would conform to the Product descriptions.

110.   Plaintiff and Members of the Classes reasonably and justifiably relied on the foregoing express warranties, believing that the Products did in fact conform to those warranties, were safe for their infant's use and met all industry and regulatory standards.

111.   Defendant has breached the express warranties made to Plaintiff and Members of the Classes by failing to provide safe Products as promised on the Products' front label and advertising.

112.   Plaintiff and Members of the Classes paid a premium price for the Products but did not obtain the full value of the Products as represented. If Plaintiff and Members of the Classes had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff and Members of the Classes suffered injury and deserve to recover all damages afforded under the law.

113.   On May 23, 2024, Plaintiff sent Defendant a notice letter notifying Defendant of its breach of warranty.

**SIXTH CLAIM FOR RELIEF**
**Breach of Implied Warranty**
**(*On Behalf of Plaintiff, individually and on behalf of the Nationwide Class, or in the Alternative, the California Class*)**

114.   Plaintiff repeat the allegations contained in paragraphs 1-62 above as if fully set forth herein.

115.   Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class, or in the alternative, California Class against Defendant.

116.   California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

117.    California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2)(f).

118.    Defendant is a merchant with respect to the sale of Products. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to consumers.

119.    By advertising the Products with representations about the safety of the Products and the Products' compliance with all industry and regulatory standards on the Products' front label and advertising, Defendant made an implied promise that the Products were safe for use by the Plaintiff's infant and met all industry and regulatory standards. However, the Products have not "conformed to the promises…made on the container or label" because the Products are not safe and do not meet industry and regulatory standards. Plaintiff, as well as other consumers, did not receive the goods as impliedly warranted by Defendant to be merchantable. Therefore, the Products are not merchantable under California law and Defendant have breached its implied warranty of merchantability in regard to the Products.

120.    If Plaintiff and Members of the Classes had known that the representation of the safety of the Products and the industry and regulatory standard compliance were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Defendant's breach, Plaintiff and Members of the Classes have suffered injury and deserve to recover all damages afforded under the law.

121.    On May 23, 2024, Plaintiff sent Defendant a notice letter notifying Defendant of its breach of warranty.

**SEVENTH CLAIM FOR RELIEF**
**Quasi Contract/Unjust Enrichment/Restitution**
**(*On Behalf of Plaintiff, individually and on behalf of the Nationwide Class, or in the Alternative, for the California Class*)**

-35-

122.   Plaintiff repeats the allegations contained in paragraphs 1-62 above as if fully set forth herein.

123.   Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

124.   As alleged herein, Defendant has intentionally and recklessly made misleading representations to Plaintiff and Members of the Classes to induce them to purchase the Products. Plaintiff and Members of the Classes have reasonably relied on the misleading representations and have not received all of the benefits promised by Defendant through the Products' representations. Plaintiff and Members of the proposed Classes have therefore been induced by Defendant's misleading and deceptive representations about the Products, and paid more money to Defendant for the Products than they otherwise would and/or should have paid.

125.   Plaintiff and Members of the proposed Classes have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiff and Members of the proposed Classes.

126.   The monies received were obtained under circumstances that were at the expense of Plaintiff and Members of the proposed Classes—*i.e.*, Plaintiff and Members of the proposed Classes did not receive the full value of the benefit conferred upon Defendant. Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon it.

127.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Members of the proposed Classes are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct as alleged herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Classes, respectfully prays for following relief:

A.    Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiff as Class representative, and appointment of her counsel as Class Counsel;

B.    A declaration that Defendant's actions, as described herein, violate the claims described herein;

C.    An award of injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the proposed Classes, including, *inter alia*, an order prohibiting Defendant from engaging in the unlawful act described above;

D.    An award to Plaintiff and the proposed Classes of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the proposed Classes as a result of its unlawful, unfair and fraudulent business practices described herein;

E.    An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct;

F.    An award of nominal, punitive, and statutory damages;

G.    An award to Plaintiff and her counsel of reasonable expenses and attorneys' fees;

H.    An award to Plaintiff and the proposed Classes of pre and post-judgment interest, to the extent allowable; and

I.    For such further relief that the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the proposed Classes, hereby demands a jury trial with respect to all issues triable of right by jury.

DATE: May 23, 2024

*/s/ Benjamin Heikali*

Benjamin Heikali (SBN 307466)
**TREEHOUSE LAW, LLP**
2121 Avenue of the Stars, Suite 2580
Los Angeles, CA 90067
Tel: (310) 751-5928
bheikali@treehouselaw.com

Melissa S. Weiner
Ryan T. Gott**
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Tel: 612-389-0600
Fax: 612-389-0610
mweiner@pwfirm.com
rgott@pwfirm.com

Rachel Soffin**
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: 865-247-0080
rsoffin@milberg.com

Harper T. Segui**
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLP**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
hsegui@milberg.com

*Attorneys for Plaintiffs and the Putative
Classes*

***Pro Hac Vice Forthcoming*

-38-

Vinesign Document ID: 45C81E4A-E6B2-47FF-B3CB-A8552C67C851

## <u>Venue Declaration Pursuant to Cal. Civ. Code 1780(d)</u>

I, Megan Fehrenbach, declare as follows:

1.      I am the named Plaintiff in the above-captioned action and a citizen of the State of California. I have personal knowledge of the facts set forth in this declaration, and am competent to testify to the same. The matters set forth herein are true and correct to the best of my knowledge and belief.

2.      I believe that the Central District of California is a proper place for trial of this case because Defendant maintains its principal place of business in Newport Beach, California, which is in the Central District of California.

I declare under penalty of perjury that the foregoing is true and correct, executed on _____05/23/2024_____ in Escondido, California.

_____

_____

Megan Fehrenbach